# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BENJAMIN McCRIMON, | ) | CASE NO. 1:19CV1718 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Benjamin McCrimon ("Plaintiff" or "McCrimon"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

On June 21, 2016, McCrimon filed an application for SSI alleging a disability onset date of May 25, 2016, and claiming he was disabled due to back, neck and leg pain. (Transcript ("Tr.") at

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

163, 180.)  The applications were denied initially and upon reconsideration, and McCrimon requested a hearing before an administrative law judge ("ALJ").  (Tr. 105-07.)

On March 20, 2018, an ALJ held a hearing, during which McCrimon, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 38-53.)  On July 27, 2018, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id*. at 15-33.)  The ALJ' s decision became final on June 11, 2019, when the Appeals Council declined further review.  (*Id*. at 1-6.)

On July 30, 2019, McCrimon filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15).  McCrimon asserts the following assignments of error:

(1)  Whether substantial evidence supports the residual functional capacity assessment as determined by the Administrative Law Judge.

(2)  The ALJ erred in not including and addressing Plaintiff's use and need for a cane in the RFC determination.

(Doc. No. 1 at 1.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

McCrimon was born in December 1960, and was 55 years-old at the time of his administrative hearing, making him an "individual of advanced age" under social security regulations.  (Tr. 32.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has at least a high school education and is able to communicate in English.  (*Id*.)  He has no past relevant work.  (*Id*.)

**B.     Relevant Medical Evidence[2]**

**1.     Mental Impairments[3]**

On July 19, 2016, Mr. McCrimon was seen by Dr. Geehan Botros in Internal Medicine at MetroHealth Medical Center to establish care. (Tr. 311.) Mr. McCrimon had closed his eyes during the history and exam, and answered questions briefly. (*Id.*) He reported back pain, remote history of depression, a remote suicide attempt and using cocaine when depressed. (*Id.*) Dr. Boros diagnosed back pain and depressed mood, and started him on a small does of citalopram. (*Id.* at 312.)

On July 26, 2016, McCrimon went to the MetroHealth clinic with concerns about a possible adverse reaction to citalopram. (*Id.* at 307.) He reported red spots on his arm and shoulder. (*Id.* at 306.) He also reported daily thoughts of self-harm. (*Id.*) The Nurse Practitioner advised him to stop taking citalopram and to make an appointment with psychiatry. (*Id.*)

On August 31, 2016, McCrimon was seen by consulting physician Dorothy Bradford at the request of the state agency. (*Id.* at 274.) Dr. Bradford observed "no depressive symptoms." (*Id.*)

On October 6, 2016, Dr. Botros treated McCrimon for an acute care visit for pain. (*Id.* at 303.) He noted McCrimon's lack of eye contact, and frustration, and increased his dose of citalopram. (*Id.* at 303-05.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] McCrimon's SSI application is based on allegations of physical impairment, and the errors alleged in this case relate to the ALJ's assessment of his physical abilities in the assessment of residual functional capacity ("RFC"). Therefore, limited mental health evidence was cited by the parties.

On November 1, 2016, McCrimon saw Dr. Botros again and complained of widespread body and joint pains. (*Id*. at 300.) He had not gone for a psychiatric appointment, "escaped taking citalopram for no particular reason," and reported that "he always sees something crawling." (*Id*.) Dr. Botros noted that McCrimon was "not a reliable historian with [i]nappropriate verbal behavior and [n]ot following care plan." (*Id*.) He diagnosed bipolar I disorder, depressed. (*Id*. at 301.)

On March 3, 2017, McCrimon saw Dr. Botros and reported improvement in his depression since increasing the citalopram. (*Id*. at 537.) McCrimon continued to demonstrate poor eye contact, his speech was slow and monotonous, he had depressed mood, and preoccupations with recent erectile dysfunctions. (*Id*. at 537-388.) Dr. Botros diagnosed depression, unspecified depression type and erectile dysfunction. (*Id*. at 538.)

**2.     Physical Impairments**

On June 17, 2016, McCrimon began treatment at The Link Spine and Sports Rehabilitation for sprain of lumbar spine, cervical spine and left knee after a motor vehicle accident on May 25, 2016. (*Id*. at 244.) He reported constant, sharp, dull, and aching pain in the neck, lower back and left knee. (*Id*.) He also reported moderate increased pain with range of motion and told the chiropracter he had difficulty performing recreational activities and activities of daily living. (*Id.)* On examination, McCrimon was found to walk with a mild antalgic gait favoring the left knee. (*Id*. at 261.) The Link provided "a conservative treatment plan," including chiropractic manipulation and adjunctive therapies. (*Id*. at 244.)

On July 19, 2016, McCrimon was seen by Dr. Botros in Internal Medicine at MetroHealth Medical Center to establish care. (*Id*. at 311.) McCrimon reported back pain, remote history of

depression, and using cocaine when depressed. (*Id*.) Dr. Botros diagnosed back pain and depressed mood. (*Id*. at 312.)

On August 9, 2016, McCrimon completed treatment at The Link. (*Id*. at 245.) McCrimon reported that his pain had been "reduced and essentially resolved" with the "conservative" therapy, and his objective finding were now within normal limits. (*Id.)* Chiropractor James Alberty noted that, due to the nature of his injury, McCrimon might be prone to flare-ups and predisposed to future injuries. (*Id*. at 245.)

On August 31, 2016, McCrimon was seen by consulting physician Dr. Bradford at the request of the state agency. Dr. Bradford referred McCrimon for an x-ray of his lumbar spine, which revealed minimal arthritis, and no fractures or spondylolisthesis. (*Id*. at 265.) She also referred him for an x-ray of the knee, which demonstrated minimal arthritis. (*Id*. at 266.) McCrimon reported pain in his left wrist, low back, and left knee, and he wore braces on all three of these body parts, including three braces on his left knee. (*Id*. at 274.) He reported that the wrist and knee braces relieved his wrist and knee pain, but the back pain was constant even with the brace, and worsened with bending or stooping. (*Id*.) He also reported having morning stiffness for about 15 minutes and swelling of the right middle finger. (*Id*. at 275.) Dr. Bradford's examination revealed decreased lumbar flexion, bilateral lower paraspinal muscle tenderness, left wrist tenderness, and left patellar tenderness. (*Id*. at 270, 276.) Dr. Bradford stated that there were no findings on x-ray or her clinical exam to explain or support McCrimon's symptoms. (*Id*. at 277.)

On October 6, 2016, McCrimon returned to Dr. Botros for treatment of pain at multiple sites which he described as continuous day and night and aggravated by sitting, standing, and sleeping. (*Id*. at 303.) He was taking Ibuprofen, which he reported helped ease the pain but did not eliminate

it.  (*Id*.)  McCrimon expressed frustration that no one seemed to be listening to him.  (*Id*.)  Dr. Botros diagnosed chronic pain disorder, generalized osteoarthritis, and depressed mood.  (*Id*. at 305.)

On November 1, 2016, McCrimon saw Dr. Botros again, seeking treatment for widespread body and joint pains.  (*Id*. at 300).  Dr. Botros diagnosed knee pain, unspecified chronicity, unspecified laterality, and bipolar I disorder, depressed.  (*Id*. at 301).

On November 21, 2016, McCrimon was seen at MetroHealth's Department of Physical Medicine and Rehabilitation by Dr. Victoria Whitehair, seeking treatment of pain on the left side of his chest and middle of his back, which he reported had begun suddenly three days prior.  (*Id*. at 291.)  Dr. Botros had referred him for evaluation of his left knee pain, but since he was complaining of chest pain, he was assessed for this instead.  (*Id*. at 291.)  McCrimon reported taking Neurontin, Motrin, and Celexa.  (*Id*.)  His range of motion was mildly decreased in all planes, he had extreme tenderness at the left thoracic and lumbar paraspinals, mild tenderness into the left shoulder girdle, straight leg raise caused increased back pain on the left side, reflexes were 1+, and motor strength was mildly decreased in bilateral hip flexors.  (*Id*. at 293.)  His diagnoses were history of depression, acute left sided chest pain which was believed to be a thoracic muscle strain, and he was sent to the emergency room for the pain.  (*Id*.)

On the same day, Mr. McCrimon went to the emergency room for treatment of chest pain on his left side that radiated around the side of the chest wall to the back.  (*Id*. at 317.)  He described the pain as sharp and stabbing, worse with breathing, and associated with some shortness of breath. (*Id*.)  Neither chest x-rays nor a pulmonary CT scan revealed any acute cardiopulmonary process. (*Id*. at 318-19.)  The pain was reproducible with palpation.  (*Id*. at 318.)

On November 28, 2016, McCrimon returned to Dr. Whitehair, reported that his chest pain was gone, and sought treatment for his knee pain. (*Id*. at 478-479.) On examination Dr. Whitehair observed tenderness to palpitation at the lateral join line, lateral patella and lateral tibial tubercle, inferior effusion, +McMurrays, + Patellar grind test, +pain with Varus stress, +Patellar apprehension, reflexes were 1+ in McCrimon's lower extremities bilaterally with slightly lower Achilles respond on the left, and decreased sensation planter aspect of all five toes on his left foot. (*Id*. at 481.) His gait and motor strength were normal. (*Id*.) McCrimon was diagnosed with chronic life knee pain due to post-traumatic osteoarthritis and likely remote LCL, lateral meniscus injury. (*Id*.) He was referred to physical therapy and for a knee x-ray. (*Id*.) He was prescribed Flexeril, Naprosyn, and Gabapentin. (Tr. 512-13.)

A left knee x-ray performed on the same day showed mild degenerative changes involving the patella with slight narrowing of patellofemoral spaces bilaterally. (*Id*. at 485.)

On February 3, 2017, McCrimon was seen by Dr. Botros with continued complaints of shoulder and chronic lower back pain. (*Id*. at 516.) Dr. Botros diagnosed chronic pain disorder and increased his Gabapentin dose. (*Id*. at 517.)

On September 8, 2017, McCrimon went to the Orthopaedics clinic and was seen by Nicholas Sherry, PA-C, for treatment of pain in his left knee pain. (*Id*. at 529.) McCrimon sought treatment for left knee pain on the medial aspect. (*Id*.) He reported the pain began nine months prior, and was worse with activity and better with rest. (*Id*.) He described a popping sensation in his knee cap with flexion and extension. (*Id*.) PA Sherry noted tenderness to palpitation over the medial joint line. (*Id*.) He diagnosed mild osteoarthritis of the left knee and he offered an injection and referred to

physical therapy.  (*Id*. at  530.)  An injection of lidocaine and Kenalog was given in the office.  (*Id*.) A cane was ordered. (*Id*. at 531.)

On December 15, 2017, McCrimon was again seen by PA Sherry and reported that his left knee had not improved after his last injection.  (*Id*. at 528.)  He had not completed physical therapy, and PA Sherry advised him to do so.  (*Id*.)  He received his cane.  (*Id*. at 222.)  He was diagnosed with patellofemoral symptoms of the left knee.  (*Id*. at 528.)

On January 18, 2018, McCrimon was seen at MetroHealth for a physical therapy evaluation for his knee pain.  (*Id*. at 539.)   He reported years of constant left knee pain, and he used a straight cane to help with ambulation.  (*Id*. at 540.)  He reported multiple falls prior to using the cane.  (*Id*.) He reported that he could stand for 15 minutes at a time and sit for 20 minutes at a time.  (*Id*.)  On examination, physical therapist Nicole Patton observed decreased weight bearing on the left lower extremity, increased tenderness upon palpation across the posterior aspect of the left knee, decreased strength in the left lower extremity, positive Varus and Valgus testing, inability to tolerate a stork stand, decreased terminal knee extension on the left, and an antalgic gait.  (*Id*. at 541-42.)   She recommended continued physical therapy.  (*Id*. at 543.)

At his second and third physical therapy appointments on January 22, 2018, and January 25, 2018, physical therapist Joseph Warszawski noted that McCrimon arrived ambulating with his straight cane, had slow antalgic gait, and decreased weight bearing on the left lower extremity.  (*Id*. at 545, 549.)

In February 2018, McCrimon stopped receiving physical therapy because he no longer had insurance coverage.  (*Id*. at 553.)

**C.    State Agency Reports**

**1.    Mental Impairments**

On September 21, 2016, state agency reviewing psychiatrist Bruce Goldsmith, Ph.D., evaluated the record and opined that McCrimon had affective disorders, alcohol and substance addition disorders that would create mild restriction in his activities of daily living and moderate restriction in his ability to maintain social functioning and ability to maintain concentration, persistence, or pace.  (*Id*. at 63-64.)

On December 7, 2016, state agency reviewing psychologist Paul Tangeman, Ph.D, evaluated the record and concurred with Dr. Goldsmith's opinion.  (*Id*. at 81-82.)

**2.    Physical Impairments**

On September 9, 2016, state agency reviewing physician Michael Lehv evaluated the record and opined that McCrimon had the following limitations to his residual functional capacity ("RFC"):

- occasionally lift or carry 50 pounds, and frequently lift or carry 25 pounds;

- stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday;

- sit (with normal breaks) for a total of 6 hours in an 8-hour workday;

- frequently climb ramps or stairs, stoop, kneel, crouch, and crawl;

- never climb ladders, ropes, or scaffolds; and

- avoid all exposure to hazards such as machinery and heights.

(*Id*. at 66-68.)

On December 7, 2016, state agency reviewing physician Maureen Gallagher evaluated the record and concurred with Dr. Lehv's opinion.

### D.    Hearing Testimony

During the March 20, 2018 hearing, McCrimon testified to the following:

- He is 57 years old.  (*Id*. at 41.)

- He became disabled on May 25, 2016, due to pain in his left knee.  He went to the hospital for treatment, but they could not identify the source of his pain, so they gave him medication and sent him home.  The medication did not relieve the pain.  (*Id*.)

- He now walks with a cane in his right hand.  He received the cane in December 2017.  He had asked repeatedly for a cane because "I've fallen plenty of times."  (*Id*. at 42.)

- On an average day, he wakes, up, has breakfast, then goes back to bed for an hour or two.  He does physical therapy exercises, then watches television.  (*Id*. at 42-43.)

- He doesn't "do too well outside communicating with people."  His medical primary car provider keeps recommending he see a psychiatrist, but he last went a year ago.  (*Id*. at 43.)

- The doctors can't identify the source of his pain.  He takes naproxen and gabapentin to treat it.  (*Id*. at 43-44.)

- He takes Celexa "for my head," and "two light allergy pills" because "I got a feeling like something's always crawling on me."  (*Id*. at 44.)

- When he did see a psychiatrist, in May 2016, he was afraid to answer his questions "because I had a feeling that he would keep me and lock me up.  I didn't want to be locked up.  I just wanted to go home and be to myself. . . . So I lashed out."  (*Id*.)

- In July of 2016, he went to MetroHealth for help with his leg pain, but left before he was treated.  He waited 45 minutes to an hour, and then "I got tired, which I shouldn't have done.  I got up, and left."  (*Id*. at 44-45.)

- He drinks about a case of beer a week, and uses cocaine once a week.  (*Id*. at 45.)

- He pays for the alcohol and cocaine by borrowing money from a friend.  (*Id*. at 46.)

- He can stand for 15 to 20 minutes before he needs to sit down because of pain.  He purchased his own knee brace because the doctors would not prescribe one.  (*Id*.)

- He seldom walks because he prefers to stay in the house. When he does have to walk, he can walk for about 20 minutes before taking a break and swinging his leg to relieve the pain. (*Id*.)

- He grocery shops about once a week. He walks from his home on 13th to the store on 36th. This walk takes him about half an hour each way, but he can't afford the bus. (*Id*. at 47.)

- Walking makes the pain in his leg worse. The only thing that helps the pain is drinking beer. (*Id*. at 48.)

- He does not notice any side effects from his medications. (*Id*.)

- He refused to see a psychiatrist in May 2017 out of fear. (*Id*.)

The ALJ then asked the VE the following hypothetical question:

Consider, if you will, a 57-year-old male, same education and work background as Mr. Mccrimon. This first person can lift and carry 50 pounds occasionally, 25 pounds frequently; could stand/walk six out of eight and sit six out of [eight]; no limits on push/pull or foot pedal; can frequently use a ramp or stairs; never a ladder, rope, or a scaffold; can constantly balance; frequently stoop, kneel, crouch, and crawl. There are no manipulative limitations, no visual deficits, no difficulties with hearing and speaking.

This person should avoid, entirely dangerous machinery and unprotected heights. This person can do simple, routine tasks; no complex tasks.

(*Id*. at 50.)

The VE testified the hypothetical individual would also be able to perform representative jobs in the economy, such as retail trade bagger, laundry worker, and linen room attendant (*Id*. at 50-51.)

The ALJ next amended the hypothetical to include limitations to lift and carry 20 pounds occasionally and 10 pounds frequently, and frequently balance. (*Id*. at 51.) The VE testified that this hypothetical individual could perform representative jobs in the economy including ticket seller, cashier, order caller. (*Id*.) These jobs are all at the light exertional level. The individual would not be able to perform work at the medium exertional level. (*Id*. at 52.)

### III.   STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.   20 C.F.R. §§ 404.1520(c) and 416.920(c).   A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

# IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since June 21, 2016, the application date.

2. The claimant has the following severe impairments: disorder of back - discogenic and degenerative, osteoarthritis, and affective disorder.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant may frequently climb ramps and stairs and never climb ladders, ropes or scaffolds. The claimant may constantly balance and frequently stoop, kneel, crouch, and crawl. The claimant may have no exposure to dangerous machinery or unprotected heights. The claimant may not perform complex tasks. The claimant is limited to simple, routine tasks.

5. The claimant has no past relevant work.

6. The claimant was born on December **, 1960 and was 55 years old, which is defined as an individual of advanced age, on the date the application was filed.

7. The claimant has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work.

9. Considering the claimant's age, education, work experiences, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since June 21, 2016, the date the application was filed.

(Tr. 17-33) (citations omitted).

# V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act,

without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

**A.      First assignment of error - Whether substantial evidence supports the residual functional capacity assessment as determined by the Administrative Law Judge.**

McCrimon asserts that the ALJ erred by failing to support his RFC finding with substantial evidence, as required by law.  (Doc. No. 13 at 9.)  He argues that the medical evidence, including his persistent complaints of lower back and knee pain, supports an RFC finding restricting him to "light work" under the Social Security regulations, because he is "incapable of the repetitive lifting involved with medium level work."  (*Id.*)  He argues that the ALJ did not provide substantial evidence to support his conclusion that McCrimon was capable of "medium work." (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's RFC finding, including medical opinions from the state reviewing physicians, examination notes, imaging, McCrimon's overall treatment history, and his activities of daily living.  (Doc. No. 15 at 10.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially

16

when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880

(citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an

obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity

determination,' and must also 'mention or refute [...] contradictory, objective medical evidence'

presented to him.")). *See also* SSR 96  8p, 1996 WL 374184 at *7 ("The RFC assessment must

always consider and address medical source opinions.  If the RFC assessment conflicts with an

opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).

While the RFC is for the ALJ to determine, however, it is well established that the claimant bears

the burden of establishing the impairments that determine his RFC.  *See Her*, 203 F.3d at 391.

Here, the ALJ found, at step two, that McCrimon suffered from the severe impairments of

discogenic and degenerative back disorders, osteoarthritis, and affective disorder.  (Tr. 17.)  At step

four, he found the following limitations to McCrimon's RFC:

> I find that the claimant has the residual functional capacity to perform medium
> work as defined in 20 CFR 416.967(c)[4] except the claimant may frequently climb
> ramps and stairs and never climb ladders, ropes or scaffolds. The claimant may
> constantly balance and frequently stoop, kneel, crouch, and crawl. The claimant
> may have no exposure to dangerous machinery or unprotected heights. The
> claimant may not perform complex tasks. The claimant is limited to simple,
> routine tasks.

(*Id.* at 20-21.)

---

[4] Social Security regulations state that:
> medium work [requires] lifting no more than 50 pounds at a time with
> frequent lifting or carrying of objects weighing up to 25 pounds. A full
> range of medium work requires standing or walking, off and on, for a total
> of approximately six hours in an 8  hour workday in order to meet the
> requirements of frequent lifting or carrying objects weighing up to 25
> pounds. As in light work, sitting may occur intermittently during the
> remaining time.

Social Security Ruling 83  10, 1983 WL 31251 at *6 (1983).

In explaining the basis for this RFC, the ALJ discussed the medical evidence regarding McCrimon's physical impairments at some length. (*Id.* at 22-25.) He first discussed the origin of the impairments:

> The claimant's medical records show that the claimant has experienced left knee pain since the 1980s, when he fell and injured himself. In addition, the claimant also has long reported lower back pain, since at least 2011. Imaging of the claimant's left knee, taken in 2011, showed that the claimant had minimal spurring at the inferior posterior margin of the patella, but otherwise normal findings. Imaging of the claimant's lumbar spine, taken in 2011, showed no abnormalities.

(*Id.* at 22.) He then discussed the history of McCrimon's chiropractic care, which began in June, 2016. (*Id.*) The chiropractic treatment was effective, and in August 2016, his chiropractor noted McCrimon had achieved "full recovery," and stopped treating him. (*Id.*)

Next, the ALJ discussed the treatment that McCrimon received from his primary care physician, Dr. Botros, who initially recommended chiropractic therapy and ibuprofin, but in September 2016 diagnosed chronic pain disorder and osteoarthritis, and prescribed gabapentin. (*Id.* at 23.) However, as the ALJ notes:

> Notwithstanding the new diagnoses, Dr. Boutros observed on physical examination that the claimant was in no acute distress. The claimant's range of motion in the back was normal with no sign of tenderness.

(*Id.*)

The ALJ discussed the report of independent examiner Dr. Bradford, who noted that McCrimon "had normal station and posture" and "was not using a mobility aid," when she examined him in August 2016. (*Id.* at 22.) She observed, " [His] gait was normal and he moved easily about the examination room." (*Id*.) Dr. Bradford also noted normal strength and tone in his back and

upper extremities, with no sign of muscle atrophy, although she observed he had a "mildly reduced range of motion" in his lower back. (*Id.* at 22-23.)

The ALJ discussed the records from McCrimon's rehabilitation specialist, Dr. Placeway. (*Id.* at 23-24.) Records from therapy show "normal motor strength in the bilateral lower extremities and normal gait." (*Id.* at 23.) X-rays still showed "mild degenerative changes involving the [left] patella," but Dr. Placeway's examination showed McCrimon retained full range of motion in his left knee. (*Id.*) He advised switching from ibuprofin to naproxin for the pain, and referred McCrimon to physical therapy to stretch and strengthen his knee. (*Id.* at 23-24.)

The ALJ discussed the treatment notes of orthopaedic PA Sherry, who diagnosed mild osteoarthritis of the left knee in September 2017. (*Id.* at 24.) He did not believe an MRI was warranted, gave McCrimon an injection to help with his pain, and recommended physical therapy, which McCrimon did not pursue at that time. (*Id.*) In December 2017, PA Sherry noted that McCrimon had begun using a straight cane, but his findings on physical examination had not changed. (*Id.*) He again advised McCrimon to begin physical therapy. (*Id.*)

Finally, the ALJ discussed the records from the two physical therapy treatment sessions that McCrimon attended, beginning in January 2018. (*Id.*) The physical therapists noted that McCrimon initially experienced increased pain, but "planned to continue gradual advances to his exercise program." (*Id.*) The ALJ noted that physical therapy ended early due to McCrimon's loss of insurance. (*Id.*)

All of this evidence supports the ALJ's determination that McCrimon was capable of "medium work" under the regulations. Under the circumstances presented, it was reasonable for the ALJ to discount McCrimon's subjective complaints in formulating the RFC, and find him capable

of "medium work." McCrimon highlights evidence which he asserts supports a more restrictive RFC determination, but it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 807 (6th Cir. 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") The ALJ provided specific reasons for his determination of McCrimon's RFC and supported those reasons with reference to substantial evidence in the record. While conflicting evidence may exist in the record, Sixth Circuit law is clear: "as long as substantial evidence supports the Commissioner's decision, we must defer to it, 'even if substantial evidence in the record would have supported an opposite conclusion.'" *Warner v.Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004), *quoting Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). Therefore, McCrimon's first assignment of error is without merit.

**B.      Second assignment of error: whether the ALJ erred in not including and addressing Plaintiff's use and need for a cane in the RFC determination.**

McCrimon asserts that the ALJ erred by failing to take into account McCrimon's use of a cane for ambulation in his assessment of McCrimon's RFC. (Doc. No. 13 at 11.) He points out that his mental healthcare provider recommended that he ask his primary care physician about a cane on November 1, 2016, although he did not actually receive the cane until December 15, 2017. (Doc. No. 13 at 11.) He asserts that the cane was not ordered at his request, but rather because of clinical findings of tenderness, "flexion at the very end of normal, and no extension" in his knee. (*Id.*) He

argues that the cane is necessary for his ambulation, and therefore should have been considered a restriction of limitation on his ability to work under Social Security Regulation ("SSR") 96-9p. (*Id.* at 12.)

The Commissioner responds that the ALJ acknowledged McCrimon's testimony that he needed a cane to walk, and the medical record which showed a cane was ordered for him, but found no evidence in the record supporting McCrimon's assertion that he fell without the cane. (Doc. No. 15 at 10-11.) Further, the Commissioner asserts the record evidence does not establish the cane was a "necessary device" under SSR 96-9p. (*Id.* at 11.) Therefore, he asserts substantial evidence supports the ALJ's decision not to include the use of a cane in McCrimon's RFC. (*Id.*)

SSR 96-9p states, in relevant part:

> *To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed* (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1996) (emphasis added). Interpreting this ruling, the Sixth Circuit has explained that where a cane "was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). The Sixth Circuit has not directly ruled on this issue but other courts in this district have noted that, in cases involving assistive devices including a cane, documentation "describing the circumstances for which [the assistive device] is needed" is critical to establishing that it qualifies as a "necessary device" under SSR 96-9p. *McGill v. Comm'r*

*of Soc. Sec. Admin.*, No. 5:18 CV 1636, 2019 WL 4346275, at *10 (N.D. Ohio Sept. 12, 2019), citing

*Carreon v. Massanari*, 51 F. App'x at 575; *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012)

(noting that a finding of medical necessity of an assistive device requires a statement of the

circumstances in which it is needed and that other circuits "have required an unambiguous opinion

from a physician stating the circumstances in which an assistive device is medically necessary");

*Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) (prescription for a cane from the

Veteran's Administration insufficient to show medical necessity); *Howze v. Barnhart*, 53 F. App'x

218, 222 (3d Cir. 2002) (prescription and references that claimant used a cane insufficient to show

medical necessity).

In the instant case, the ALJ addressed McCrimon's assertions regarding his need to use a

cane in his explanation of his RFC determination, stating:

> [C]ontrary to the claimant's allegations of requiring a cane due to frequent falls,
> the claimant's medical records document no reports of falls prior to his physical
> therapy visits in 2018. On physical examinations, there was never any edema or
> swelling noted in the lower extremities or bruising. Moreover, his Romberg sign
> was negative, indicating that his balance remained intact.

(Tr. 25.)

The medical records McCrimon cites to support his alleged need for a cane begin with a

note in his mental health treatment file that on November 1, 2016, he reported pain in his back,

wrists, hands, knees, and feet to mental health clinician, who noted "Patient sees another care

provider for the pain," and suggested he "have the [primary care provider] fill out a medical

equipment request so he can have a walking cane." (*Id.* at 296.) Next, he notes that in September

2017, PA Sherry, who was treating him in the Orthopaedic Clinic, ordered him a cane. (Doc. No.

13 at 11.) However, the record that he cites is the "consignment intake/delivery ticket" which shows

the cane was ordered but offers no medical rationale for doing so. (Tr. 222.) PA Sherry's treatment notes from McCrimon's September 2017 appointment, when the cane was ordered, and December 2017 appointment, when the cane was received, both make no mention of a cane. (*Id.* at 528-530.) Finally, McCrimon points to physical therapy treatment notes from January 2018 which state that "patient arrived ambulating with straight cane, slow antalgic gait" and "patient arrived ambulating with straight cane displaying decreased weight bearing through left [leg]." (*Id.* at 542, 545, 549.) None of these medical records is from a physician. Further, none of the records state that the cane is medically necessary, let alone set forth the circumstances in which it is necessary, as SSR 96-9p requires. In similar situations, multiple courts throughout this Circuit upheld ALJ decisions that did not include the need for a cane in a claimant's RFC. *See, e.g., Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506 at *19 (N.D. Ohio Dec. 12, 2018) ("Moreover, as [the doctor's] confirmation of a cane prescription does not indicate 'the circumstances for which [the cane] is needed,' it does not fulfil the requirements under SSR 96-9p."); *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 WL 1146356 at *6 (S.D. Ohio March 13, 2019) (finding ALJ did not err in not including a limitation for a cane where physician indicated claimant would need a cane but did not describe the specific circumstances for which a cane is needed as required by SSR 96-9p); *Salem v. Colvin*, No. 14-CV-11616, 2015 WL 12732456 *4 (E.D. Mich. Aug. 3, 2015) (finding the ALJ did not err in not including a limitation for a cane, when it had been prescribed, but the prescription did not "indicate the circumstances in which [the claimant] might require the use of a cane."); *Marko v. Comm'r of Soc. Sec.*, No. 2:16-cv-12204, 2017 WL 3116246 at *5 (E.D. Mich. July 21, 2017) (rejecting claimant's assertion that the ALJ failed to account for her use of a cane, stating that nothing in the physician's "mere prescription for a cane provides evidence to indicate the frequency

23

with which the cane should be used, its purpose, or its limit upon Plaintiff's ability to perform light work" (citations omitted)).  Therefore, the ALJ appropriately applied SSR 96-9p in omitting the use of a cane from his determination of RFC, and McCrimon's second assignment of error is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 24, 2019